IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION - CINCINNATI

| | | |
|---|---|---|
| CLINT WEDLAKE, | : | Case No. 1:22-cv-656 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| INEOS ABS (USA) LLC, | : | |
| Defendant. | : | |

## ORDER AND OPINION

This case is before the Court on Defendant's Motion for Summary Judgment (Doc. 37). Plaintiff filed a Response in Opposition (Doc. 45), to which Defendant filed a Reply in Support (Doc. 46). This matter is thus ripe for review. For the following reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 37).

## BACKGROUND

Defendant INEOS is a chemical company involved in the manufacturing and refinery of materials such as polymers. (Bennett Dep., Doc. 27, Pg. ID 136-37.) Its polymerization process operates 24 hours a day, seven days a week. (Wedlake Dep., Doc. 29, Pg. ID 323.) The technicians involved in the polymerization process work on a rotating shift, which means they rotate between day shift and night shift. (*Id.*; Bennett Dep., Doc. 27, Pg. ID 161.) They each report to a Shift Supervisor ("Supervisor"), who works the same rotating shift as the technicians he supervises to ensure continuous supervision and accountability. (Bennett Dep., Doc. 27, Pg. ID 143, 165-66.) Plaintiff Clint Wedlake was

employed as a Supervisor. (Wedlake Dep., Doc. 29, Pg. ID 321.) He brought this action because he alleges that Defendant failed to reasonably accommodate him for a disability by refusing to allow him to work only day shift as a Supervisor. (*See* Compl., Doc. 1.)

## I. Defendant's Operations and the Supervisor Position

Before forming the Supervisor position, Defendant had used a "shift coach" model to keep track of technicians. (Bennett Dep., Doc. 27, Pg. ID 160-161.) Shift coaches worked rotating shifts like the technicians, but the technicians did not directly report to them. (*Id.*) Instead, technicians reported to a manager. (*Id.*) Interactions between technicians and their manager were limited, however, due to their shifts not always aligning. (*Id.* at Pg. ID 161.) Defendant viewed this arrangement as problematic because there was a lack of understanding and accountability when it came to the technicians working night shift. (*Id.* at Pg. ID 160.)

To address this problem, Defendant replaced the shift coach position by creating the Supervisor position in 2018. (Bennett Dep., Doc. 27, Pg. ID 141.) The Supervisor position involves the same rotating shifts as a shift coach but includes the additional "accountability and responsibility of supervising technicians." (*Id.* at Pg. ID 143, 165-66.) Its written job description provides that the Supervisor position is a "hands-on" position "on a rotating shift schedule to provide continuous operations coverage." (Job Description, Doc. 29-1, Pg. ID 432.)

The Polymerization Department consists of four crews of technicians—A, B, C, and D crews. (Wedlake Dep., Doc. 29, Pg. ID 321.) Each Supervisor is charged with supervising the same particular crew of twelve technicians. (Job Description, Doc. 29-1,

2

Pg. ID 432.) And, because each crew of technicians rotates, the Supervisor's shift rotates with them to ensure continuity of supervision by the same Supervisor. (Bennett Dep., Doc. 27, Pg. ID 151, 159.) Supervisors spend half of their working time on the night shift due to the nature of this rotating schedule. (Turner Dep., Doc. 36, Pg. ID 727.)

At times, a Supervisor's individual shift has been covered on a short-term basis due to illness or vacation. (Bennett Dep., Doc. 27, Pg. ID 160.) Jackie Turner, a "relief shift supervisor," would cover these shifts on an as-needed basis. (Turner Dep., Doc. 36, Pg. ID 724, 730-31.) When asked why a Supervisor could not be responsible for supervising a different crew on an extended basis, Brian Bennett—the previous Human Resources Manager—responded that:

> It's the whole reason we went to the shift supervisor model, there was lack of accountability on the operations. There were errors being made. There was a lack of understanding of what was going on on the night shifts. That's why we created the shift supervisor position and transitioned out of the shift coach position, where they didn't have direct people responsibility.

(Bennett Dep., Doc. 27, Pg. ID 137, 159-160.)

## II. Plaintiff's Employment and Requests for Accommodation

Plaintiff Clint Wedlake began working for Defendant in November 2015 as a process technician. (Wedlake Dep., Doc. 29, Pg. ID 318.) Around three years later, in January 2019, Plaintiff became a Supervisor. (*Id.* at Pg. ID 321.) In line with the structure explained above, Plaintiff worked rotating shifts supervising the "D crew" of technicians in the polymerization process. (*Id.* at Pg. ID 323.)

On February 25, 2021, Plaintiff reported to Kera Studer, Defendant's on-site nurse at the time, that he was having heart palpitations and felt lightheaded. (Wedlake Dep.,

3

Doc. 29, Pg. ID 327.) After Studer performed an electrocardiogram ("EKG"), she suggested that Plaintiff go to the emergency room. (*Id.*) Plaintiff did and was ultimately told to follow up with a cardiologist. (Discharge Instructions, Doc. 29-1, Pg. ID 458.) On March 4, 2021, Plaintiff had an appointment with cardiologist Dr. Santosh Menon. (Wedlake Dep., Doc. 29, Pg. ID 341.) Dr. Menon diagnosed that premature ventricular contractions ("PVCs") were possibly causing Plaintiff's symptoms. (Menon Dep., Doc. 34, Pg. ID 619.) PVCs are a "specific type of heart palpitation." (*Id.* at Pg. ID 617.)

Dr. Menon suspected that sleep deprivation was causing Plaintiff's symptoms or "making things worse," so he asked Plaintiff to restrict his work to only day shifts. (Menon Dep., Doc. 34, Pg. ID 621; Medical Plan, Doc. 34-2, Pg. ID 670.) Dr. Menon wrote the following note for Plaintiff to give Defendant: "Due to medical reasons, Clint Wedlake may return to work on day shift only, at least through April 28, 2021." (3/4/2021 Doctor Note, Doc. 34-3, Pg. ID 671.) Plaintiff relayed this note to Studer, who then asked Plaintiff's supervisor Steve Young, Bennett, and the regional payroll coordinator about a potential day shift accommodation. (Wedlake Dep., Doc. 29, Pg. ID 346; 3/4/2021 Email, Doc. 27-1, Pg. ID 246.) The request for day shift was not approved. (Bennett Dep., Doc. 27, Pg. ID 192.)

Plaintiff then submitted a short-term disability request, and he was approved for 22 weeks of fully paid leave and four weeks of sixty-six percent paid leave. (Disability Form, Doc. 29-1, Pg. ID 474-75; Wedlake Dep., Doc. 29, Pg. ID 357.) On April 7, 2021, Plaintiff met with Young and inquired into two possible accommodations for returning as a Supervisor: (1) allowing Plaintiff to work only day shifts, or (2) moving all

4

Supervisors to either day-only shift or night-only shift. (Wedlake Dep., Doc. 29, Pg. ID 347-49.) When asked during his deposition whether it would have been possible for Plaintiff to work only day shifts, Young responded that "[a]nything is possible." (Young Dep., Doc. 25, Pg. ID 124.) As Young lacked authority to make such changes, he told Plaintiff to contact Bennett. (*Id.* at Pg. ID 115; Wedlake Dep., Doc. 29, Pg. ID 349-50.) Bennett told Plaintiff that such an accommodation would be unlikely. (Wedlake Dep., Doc. 29, Pg. ID 351.)

Plaintiff provided Defendant with an updated doctor's note extending his day-shift only restriction until August 31, 2021. (6/2/2021 Doctor Note, Doc. 29-1, Pg. ID 486.) Plaintiff then filed for long-term disability on August 17, 2021. (Disability Application, Doc. 29-1, Pg. ID 492.) His application was denied. (Claim Denial, Doc. 29-1, Pg. ID 537-42.) While Plaintiff's pay for short-term disability leave ended in late August 2021, he remained on unpaid leave with healthcare benefits. (Wedlake Dep., Doc. 29, Pg. ID 383; 6/10/2021 Email, Doc. 29-1, Pg. ID 484-85.)

On September 20, 2021, Defendant received another note from Dr. Menon—this time recommending that Plaintiff work only day shift with no reference to an end date. (9/20/2021 Doctor Note, Doc. 29-1, Pg. ID 534.) Bennett reached out to Plaintiff for an update in April 2022, and Plaintiff expressed an interest in returning to work. (4/12/2022 Letter, Doc. 29-1, Pg. ID 544; 4/21/2022 Email, Doc. 29-1, Pg. ID 545-46.) So, Bennett requested updated medical information from Plaintiff. (4/21/2022 Email, Doc. 29-1, Pg. ID 545.) Plaintiff then obtained a note from Dr. Menon that again recommended that Plaintiff work only day shifts based on his medical evaluation. (4/29/2022 Doctor Note,

5

Doc. 29-1, Pg. ID 547.) Bennett advised Plaintiff that, in light of his permanent day-shift restriction, he would be unable to perform the essential rotating shift function of a Supervisor. (5/11/2022 Correspondence, Doc. 29-1, Pg. ID 548; 5/29/2022 Email, Doc. 29-1, Pg. ID 549.) That said, Bennett told Plaintiff he would provide updates as to openings for other positions. (5/11/2022 Correspondence, Doc. 29-1, Pg. ID 548.)

Bennett thereafter advised Plaintiff that a laboratory technician position was available. (Wedlake Dep., Doc. 29, Pg. ID 397-98, 403.) This position involves rotating morning and afternoon shifts—rather than the rotating day and night shifts of the Supervisor position. (*Id.*) Dr. Menon cleared Plaintiff for such work. (7/28/2022 Doctor Note, Doc. 29-1, Pg. ID 554.) So, on August 15, 2022, Plaintiff started working as a laboratory technician. (Wedlake Dep., Doc. 29, Pg. ID 404.)

## PROCEDURAL HISTORY

On November 11, 2022, Plaintiff filed a complaint against Defendant for (1) failure to accommodate under the Americans with Disabilities Act ("ADA"), (2) failure to accommodate under Ohio law, and (3) wrongful discharge in violation of public policy. (*See* Compl., Doc. 1.) On November 3, 2023, the Court dismissed Plaintiff's wrongful discharge claim. (*See* Dismissal Order, Doc. 38.) Defendant filed the pending Motion for Summary Judgment as to the remaining failure to accommodate claims. (Motion for Summary Judgment, Doc. 37.)

## LAW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6

Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, it then becomes the nonmoving party's responsibility to point to specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009). A "mere scintilla" of evidence will not suffice. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005).

Though courts must view the evidence in the light most favorable to the nonmoving party, courts are under no obligation to search the record for genuine issues of material fact. *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

Plaintiff brings failure to accommodate claims under both the ADA and Ohio law, Ohio Rev. Code § 4112.02. (*See* Compl., Doc. 1, ¶¶ 46-59.) Given that "Ohio's disability discrimination law parallels the [ADA] in all relevant respects," courts apply "the same analytical framework, using cases and regulations interpreting the ADA as guidance." *Belasco v. Warrensville Heights City Sch. Dist.*, 634 Fed. App'x 507, 514 (6th Cir. 2015) (quotations omitted).

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Such discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A).

As is the case here, a claim "premised upon an employer's failure to offer a reasonable accommodation necessarily involve[s] direct evidence (the failure to accommodate) of discrimination." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Under this direct-evidence test:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.
>
> (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.
>
> (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368 (6th Cir. 2024) (quotation omitted).

Defendant contends that it is entitled to summary judgment on Plaintiff's failure to accommodate claims based on four independent reasons: (1) Plaintiff did not have a disability as defined under the ADA; (2) Plaintiff's requested accommodation was not necessary; (3) Plaintiff was not a "qualified individual" under the ADA because he could not have performed the essential functions of the Supervisor position with or without a

8

reasonable accommodation; and (4) Defendant provided Plaintiff with reasonable accommodations. (Motion for Summary Judgment, Doc. 37, Pg. ID 737-38.) Since Plaintiff is not a "qualified individual" under the ADA, this argument is dispositive.

"Failure-to-accommodate cases typically fall into two broad categories: (1) cases where the plaintiff does not want an accommodation but instead makes the straightforward claim that he can do his job as it exists; and (2) those in which the plaintiff challenges a particular job requirement as unessential or claims that he or she can do the job with reasonable accommodations on the part of the employer." *Cooper*, 93 F.4th at 369 (quotations omitted). This case falls into the latter category. Plaintiff only makes the argument that he was otherwise qualified for the Supervisor position with the requested accommodation of working solely day shifts. (*See* Response, Doc. 45, Pg. ID 885-86; Wedlake Dep., Doc. 29, Pg. ID 349.) Accordingly, Plaintiff's failure to accommodate claims depend on whether rotating shift is an essential function of the Supervisor position. *See Wagner v. Sherwin-Williams Co.*, 647 F. App'x 645, 647 (6th Cir. 2016).

### I.  Essential Function

A job function is considered essential, rather than marginal, "if its removal would fundamentally alter the position." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (quotation omitted); 29 C.F.R. § 1630.2(n)(1). In making this determination, the ADA instructs courts to consider "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

9

Federal regulations offer more guidance. A job function may be considered essential for any of the following non-exhaustive reasons: (1) "because the reason the position exists is to perform that function"; (2) "because of the limited number of employees available among whom the performance of that job function can be distributed"; or (3) because the function is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2).

Courts evaluate whether a function is essential on a "case-by-case basis." *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (quotation omitted). In doing so, courts examine the following non-exhaustive factors:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

"Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment, but summary judgment may nonetheless be proper where a court conclusively determines that there is no genuine

10

issue as to any material fact and thus that no reasonable jury could find for the nonmoving party." *Camp v. BI-LO, LLC*, 662 F. App'x 357, 361-62 (6th Cir. 2016) (quotation omitted). Put more concretely, summary judgment is appropriate "where an employer's judgment as to essential job functions—evidenced by the employer's words, policies, and practices and taking into account all relevant factors—is job-related, uniformly-enforced, and consistent with business necessity." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 765-66 (6th Cir. 2015) (quotation omitted); *see also Wagner*, 647 F. App'x at 651 (affirming summary judgment when factors weighed in favor of an essential function and the defendant failed to offer sufficient evidence to the contrary).

### i. Employer's Judgment

The Court begins by considering the employer's judgment as to whether rotating shift is an essential function for the Supervisor position. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(i). Bennett, the former Human Resources Manager, testified that rotating shift is an essential function for the Supervisor position. (Bennett Dep., Doc. 27, Pg. ID 145-46; *see also* 5/26/2022 Email, Doc. 27-1, Pg. ID 296.) To understand why, it helps to consider why the Supervisor position was created and what it entails.

Prior to the Supervisor position, managers had little direct interaction with technicians because their shifts did not always overlap. (Bennett Dep., Doc. 27, Pg. ID 160-61.) Consequently, the "technicians weren't reporting to a supervisor on their shift" and there became a lack of understanding and accountability as to the happenings on night shift. (*Id.* at Pg. ID 160-64.) Technicians were also making mistakes. (*Id.* at Pg. ID 160.) Looking for a solution, Defendant created the Supervisor position in 2018 to

11

improve the accountability of technicians. (*Id.* at Pg. ID 141, 160.) The structure of supervision was changed by placing Supervisors on the same rotating shift schedule as their technician crew. (*Id.* at Pg. ID 143, 165-66.) Thus, the history and nature of the Supervisor position support Bennett's statement that rotating shift is an essential function.

At times, a Supervisor's individual shifts would be covered on a short-term, as-needed basis due to illness or vacation. (*See* Bennett Dep., Doc. 27, Pg. ID 160.) While such short-term coverage was acceptable, Bennett explained that placing a Supervisor on only one type of shift would reduce accountability—the "whole reason [Defendant] went to the [Supervisor] model." (Bennett Dep., Doc. 27, Pg. ID 160.) Thus, this fact does not cut against Defendant's judgment that rotating shift is an essential function.

In an effort to show a genuine issue of material fact, Plaintiff points to a portion of Young's testimony. (Response, Doc. 45, Pg. ID 886.) When asked whether it would have been possible to modify the schedule so that Plaintiff only worked day shifts, Young responded that "[a]nything is possible." (Young Dep., Doc. 25, Pg. ID 124.) But, this does not rebut rotating shift being an essential function. The inquiry is not whether a change to the function would be possible but whether removing that function would "fundamentally alter the position." *Mosby-Meachem*, 883 F.3d at 603. In other words, allowing an employee to avoid a particular function "merely shows the job could be restructured, not that [the function] was non-essential." *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001) (quotation omitted); *see also White v. Standard Ins. Co.*, 895 F. Supp. 2d 817, 835-39 (E.D. Mich. 2012), *aff'd*, 529 F. App'x 547 (6th Cir. 2013) (finding full-

time work to be an essential function despite possibility of accommodating for part-time work).

For these reasons, the Court concludes that Defendant's judgment favors a finding that rotating shift is an essential function of the Supervisor position.

### ii. Job Description

The Court next considers the written job description for the Supervisor position. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(ii). Generally, "an employer's job description is given weight and it is on the plaintiff to 'rebut the written job description concerning what constitutes an essential function of a job.'" *Equal Emp. Opportunity Comm'n v. Clarksville Health Sys., G.P.*, 617 F. Supp. 3d 844, 860 (M.D. Tenn. 2022) (quoting *Camp*, 662 F. App'x at 362). That said, courts "must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Henschel v. Clare Cnty. Rd. Comm'n*, 737 F.3d 1017, 1023 (6th Cir. 2013) (quotation omitted). Here, both support an essential function finding.

The job description for the Supervisor position is divided into several sections. (*See* Job Description, Doc. 29-1.) The "purpose of the job" section provides that the Supervisor is a "hands-on" position "on a rotating shift schedule to provide continuous operations coverage." (*Id.* at Pg. ID 432.) Other language in this section speaks to "provid[ing] direct supervision of an operations shift team" and "ensur[ing] that production activities in the assigned areas are scheduled and staffed appropriately." *Id.* Perhaps most tellingly, the full heading states "purpose of the job: describe in one phrase what contribution the job is expected to make to the organization's objectives." (*Id.*) So, by the job description's

13

plain terms, Supervisors were expected to contribute to Defendant's objectives by working this position "on a rotating shift schedule to provide continuous operations coverage." (*Id.*) The inclusion of the "rotating shift schedule" in the job description reinforces an essential function finding. *See* 29 C.F.R. § 1630.2(n)(2)(i) ("The function may be essential because the reason the position exists is to perform that function.").

Plaintiff emphasizes that the rotating shift language is not listed under the section labeled "shift supervisor essential job functions: physical requirements, visual acuity and environmental factors." (Response, Doc. 45, Pg. ID 886; Job Description, Doc. 29-1, Pg. ID 436.) Though true, the ADA does not cabin consideration of written descriptions to only certain places of a document. Rather, it simply extends consideration to the "written description" of the job. 42 U.S.C. § 12111(8). So, the fact that the "rotating shift schedule" language was included in the "purpose of the job" section—rather than the section labeled "shift supervisor essential job functions: physical requirements, visual acuity and environmental factors"—does not remove it from consideration.

The Sixth Circuit has also spoken on this very issue. "Although the fact that a job requirement does not appear under an essential-duties heading in the job description may render it somewhat less powerful evidence than if it appeared under an essential-duties heading, it does not preclude it from serving as evidence of the requirement's essential nature." *Wagner v. Sherwin-Williams Co.*, 647 F. App'x 645, 649 (6th Cir. 2016). Putting this principle into practice in *Wagner*, the Sixth Circuit found that, despite "driving" being listed in the "physical requirements" section as opposed to the "essential duties" section, the job description still supported the conclusion that driving was an

14

essential function. *Id.* Other courts have adopted similar reasoning. *See, e.g., Robert v. Bd. of Cnty. Comm'rs of Brown Cnty., Kans.*, 691 F.3d 1211, 1217 (10th Cir. 2012) ("[T]he fact that the location of her duties is specified in the 'Working Conditions' and 'Job Locations' sections, rather than the 'Essential Functions' section, does not render her fieldwork nonessential.").

Accordingly, the inclusion of the rotating shift schedule under the "purpose of the job" section supports a finding that it is an essential function of the job.

### iii. The Amount of Time Spent on the Job Performing the Function

"The amount of time spent on the job performing the function" is also a consideration. 29 C.F.R. § 1630.2(n)(3)(iii). Supervisors spend half of their working time on the night shift due to the nature of the rotating schedule. (Turner Dep., Doc. 36, Pg. ID 727.) Rotating shift is a substantial part of the job. *See Wagner*, 647 Fed. App'x at 650 (finding that "[d]riving to off-site work for 6 to 12 hours of a 48-hour work week is a substantial component of a job"). Thus, this factor supports an essential function finding.

### iv. The Consequences of Not Requiring the Incumbent to Perform

Next, the Court considers the "consequences of not requiring the incumbent to perform the function" and whether there is a "limited number of employees available among whom the performance of that job function can be distributed." 29 C.F.R. § 1630.2(n)(3)(iv), (2)(ii). There are only four Supervisors in the polymerization department. (Job Description, Doc. 29-1, Pg. ID 432.) Each Supervisor's schedule corresponds to the rotating schedule of the technicians he supervises. (Bennett Dep., Doc. 27, Pg. ID 151, 159-60.) So, a Supervisor unable to work night shifts would leave night shift technicians

15

unsupervised. (*See id.*) This lack of accountability would undermine the reason the Supervisor position was created: to provide direct supervision and reports as to the same crew on a rotating shift basis. (*Id.* at Pg. ID 160, 165-66.) Thus, these factors support an essential function finding.

### v. The Work Experience of Past Incumbents in the Job

Finally, the Court considers "the work experience of past incumbents in the job." 29 C.F.R. § 1630.2(n)(3)(vi). It is undisputed that Supervisors "all had to work" rotating shifts. (Young Dep., Doc. 25, Pg. ID 98; Wedlake Dep., Doc. 29, Pg. ID 322-23.) This consistent practice reinforces the employer's judgment that rotating shift is an essential function. *See Ford Motor Co.*, 782 F.3d at 763 (consistently requiring resale buyers to work in the same building as stampers further supports the employer's judgment that on-site attendance is essential). Thus, this factor supports an essential function finding.

\*     \*     \*

Each relevant factor points toward the same conclusion: rotating shift is an essential function of the Supervisor position. *See Rehrs v. Iams Co.*, 486 F.3d 353, 356-57 (8th Cir. 2007) (concluding that rotating shift was an essential function because: (1) plaintiff knew of the rotating shift schedule and worked such a schedule for more than two years; (2) all technicians worked on the rotating shift schedule since its inception; (3) there were no permanent exceptions to this rule; (4) the rotating shift was aimed at increasing productivity; and (5) not enforcing rotating shift would force others to work longer or exclusively the night shift). Plaintiff fails to rebut the evidence in the record or show that the rotating shift was anything but "job-related, uniformly-enforced, [or]

16

consistent with business necessity." *Ford Motor Co.*, 782 F.3d at 766 (quotation omitted). Thus, rotating shift is an essential function for the Supervisor position.

## II. Plaintiff's Proposed Accommodations

While Plaintiff proposed that he be permitted to work strictly day shift or that the Supervisor position itself be restructured into only day or night shifts (Wedlake Dep., Doc. 29, Pg. ID 349), neither accommodation is mandated under the ADA.

First, working strictly day shift would not be a reasonable accommodation because it would exempt Plaintiff from the essential function of rotating shifts. *See Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) ("[T]he ADA does not require the shifting of *essential* functions."); *Ford Motor Co.*, 782 F.3d at 763 (cleaned up) (explaining that "the essential functions and reasonable accommodation analyses run together" in such cases). Moreover, Defendant "need not create a permanent light-duty position" for Plaintiff where none previously existed. *Meade v. AT&T Corp.*, 657 F. App'x 391, 396 (6th Cir. 2016).

Second, Defendant is not obligated to entirely reconfigure the Supervisors' rotating shift schedule—which was implemented to address accountability and supervisory issues—solely to accommodate Plaintiff. *See Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 809 (6th Cir. 2020) ("The ADA is not a weapon that employees can wield to pressure employers into granting unnecessary accommodations or reconfiguring their business operations."); *Porter v. Tri-Health, Inc.*, No. 1:16-CV-978, 2018 WL 5779490, at *10 (S.D. Ohio Nov. 2, 2018) (noting that employer's business decision as to operations was "outside the province of this Court"). Thus, because Plaintiff's

proposed accommodations would have removed the essential function of rotating shift, they cannot be considered reasonable.

For all these reasons, Plaintiff was not an "otherwise qualified" individual under the ADA: he could not have performed the essential function of rotating shift with or without a reasonable accommodation. *See* 42 U.S.C. § 12111(8); *Cooper*, 93 F.4th at 368. Summary judgment must therefore be entered in favor of Defendant on Plaintiff's state and federal failure to accommodate claims.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 37). This case is **TERMINATED** from the docket.

**IT IS SO ORDERED.**

                            UNITED STATES DISTRICT COURT
                            SOUTHERN DISTRICT OF OHIO

By: _____
      MATTHEW W. McFARLAND
      UNITED STATES DISTRICT JUDGE